1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  EASTERN DISTRICT OF CALIFORNIA

10

11                          ----oo0oo----

12    UNITED STATES OF AMERICA,        CR. NO. 2:11-101 WBS

13                 Plaintiff,          MEMORANDUM AND ORDER RE:
                                       MOTION TO DISMISS INDICTMENT
14         v.

15    NELSON MAURICIO PONCE VASQUEZ,

16                 Defendant.

17

18                          ----oo0oo----

19

20         Defendant Nelson Mauricio Ponce Vasquez ("defendant")

21    is charged with one count of distribution of at least fifty grams

22    of methamphetamine in violation of 21 U.S.C. § 841(a)(1).

23    (Docket No. 1.)  Presently before the court is defendant's motion

24    to dismiss the Indictment for violation of his Sixth Amendment

25    right to a speedy trial.

26         The federal grand jury returned the Indictment in this

27    case on March 3, 2011, and it was unsealed on April 13, 2011.

28    (Docket Nos. 1, 10.)  Defendant was not arrested, however, until

1

June 18, 2013, when he attempted to travel from Oakland to
Mexico.  Defendant contends that the passage of twenty-six months
between the time he was indicted and his arrest prejudiced his
defense in violation of his Sixth Amendment right to a speedy
trial and therefore mandates dismissal of the Indictment.

         "'The Sixth Amendment guarantees that in all criminal
prosecutions the accused shall enjoy the right to a speedy
trial.'"  United States v. Beamon, 992 F.2d 1009, 1012 (9th Cir.
1993) (quoting Doggett v. United States, 505 U.S. 647, 651
(1992)).  Speedy trial challenges are assessed under a four-part
balancing test that evaluates: "'(1) whether delay before trial
was uncommonly long, (2) whether the government or the criminal
defendant is more to blame for that delay, (3) whether, in due
course, the defendant asserted his right to a speedy trial, and
(4) whether he suffered prejudice' because of the delay."  Id.
(quoting Doggett, 505 U.S. at 651).

              1.   Length of Delay before Trial

         Under the first factor, the defendant "must allege that
the interval between accusation and trial has crossed the
threshold dividing ordinary from 'presumptively prejudicial'
delay."  Doggett, 505 U.S. at 651-52.  "If the accused makes this
showing, the court must then consider, as one factor among
several, the extent to which the delay stretches beyond the bare
minimum needed to trigger judicial examination of the claim"
because "the presumption that pretrial delay has prejudiced the
accused intensifies over time."  Id.  "Depending on the nature of
the charges, the lower courts have generally found postaccusation
delay 'presumptively prejudicial' at least as it approaches one

year."  Id. at 652 n.1; see also United States v. Gregory, 322
F.3d 1157, 1161-62 (9th Cir. 2003) ("[C]ourts generally have
found that delays approaching one year are presumptively
prejudicial.").

Here, it is undisputed that the twenty-six-month delay[1]
is more than two times the threshold to show presumptive
prejudice and thus triggers the presumption of prejudice under
the first factor.  (Docket No. 93 at 7:21-24.)

2.    Attributing Blame for the Delay

"The government has 'some obligation' to pursue a
defendant and bring him to trial."  United States v. Mendoza, 530
F.3d 758, 762-63 (9th Cir. 2008) (quoting United States v.
Sandoval, 990 F.2d 481, 485 (9th Cir. 1993)).  "[I]f the
defendant is not attempting to avoid detection and the government
makes no serious effort to find him, the government is considered
negligent in its pursuit."  Id. at 763 (citing Doggett, 505 U.S.
at 653).  In Mendoza, the Ninth Circuit held that the government
was negligent when it knew the defendant lived out of the country
and relied exclusively on "put[ting] a warrant out on the law

---

[1]    For the first time in his reply and relying on an
Eleventh Circuit case, defendant contends that the eight-month
pre-indictment delay should be added to the twenty-six-month
post-indictment delay, thereby resulting in a total delay of
almost three years.  See United States v. Ingram, 446 F.3d 1332,
1339 (11th Cir. 2006) ("[O]nce the Sixth Amendment's speedy trial
analysis is triggered, it is appropriate to consider inordinate
pre-indictment delay in determining how heavily post-indictment
delay weighs against the Government.").  Even assuming that the
Ninth Circuit would follow this approach, eight months of pre-
indictment delay is not inordinate in this court's experience and
adding pre-indictment delay without knowing the reasons for the
delay would be inconsistent with the balancing test.

1  enforcement database" without making a single attempt to contact

2  the defendant to inform him of the indictment.  Id.

3       The second inquiry seeks to assess whether the

4  government or defendant "is more to blame for th[e] delay."

5  Doggett, 505 U.S. at 651.  Blame is not necessarily the same as

6  negligence in the classic sense.  By employing the terms

7  "negligent" or "negligence" in the context of this analysis, the

8  court does not understand the caselaw to require a defendant to

9  show professional negligence by the government in the sense of

10 showing that law enforcement's efforts fell below the established

11 standard of police practice in the community.  The court would

12 have to be blind to reality not to recognize that law enforcement

13 agencies must often make choices, based on limited resources, to

14 investigate some matters less thoroughly than others and search

15 less diligently for some individuals than for others.  It is not

16 for the court to fully understand or second-guess those

17 decisions.  However, what the court does understand the caselaw

18 to conclude is that when law enforcement decides not to

19 diligently search for a particular defendant, the government may

20 have to bear the responsibility for any prejudice the defendant

21 suffers as a result of that decision.

22      Here, although defendant originally argued that the

23 government failed to take any efforts to locate him after he was

24 indicted, the government submitted evidence showing otherwise.

25 Supervisory Special Agent Tehran Palmer of the Bureau of Alcohol,

26 Tobacco, Firearms, and Explosives submitted an affidavit

27 detailing the efforts made to arrest defendant.  Agent Palmer was

28 the lead agent in this case, participated in the controlled

4

methamphetamine purchases charged in the Indictment, and led the efforts to locate defendant.  (Docket No. 93-1 ¶ 3.)  Agent Palmer indicates that, after the Indictment was returned on March 3, 2011, he placed the arrest warrant for defendant in the National Crime Information Center on March 4, 2011.  (Id.)  At that point, the government believed defendant lived at 1052 Weldon Lane, which was a unit in the Mission Bay apartments in Bay Point, California.  (Id. ¶¶ 4-5.)

In April 2011, Agent Palmer conducted surveillance at the Mission Bay apartments on six separate days from approximately 6:00 to 9:00 or 9:30 a.m. and again from approximately 3:00 to 6:00 p.m.  (Id. ¶¶ 5, 9.)  During the surveillance, Agent Palmer did not see defendant or either of the two vehicles that had been associated with him.  (Id. ¶¶ 8, 10.)  In May 2011, Agent Palmer conducted an updated search of commercial databases to ascertain whether defendant had moved and discovered a new address associated with defendant, which was actually just a different unit within the same relatively small apartment complex.  (Id. ¶ 11.)

On May 13, 2011, another agent returned to the Mission Bay apartments in attempt to locate the car registered to defendant, but the attempt was unsuccessful.  (Id.)  On June 30, 2011, defendant's arrest warrant was entered into the TECS system utilized by the United States Custom and Border Protection.  (Id. ¶ 13.)  On August 3, 2011, Agent Palmer and another agent returned to the apartment complex and spoke with the onsite property manager, who indicated that she knew defendant's wife

1  fairly well and was familiar with the family, but would not

2  provide their apartment unit number.  (Id. ¶ 14.)

3           On August 13, 2011, Agent Palmer and other agents, for

4  the first time in uniform, attempted to arrest defendant at the

5  apartment complex at the last known unit associated with him.

6  (Id. ¶ 16.)  Agent Palmer knocked approximately six to ten times

7  and announced the police presence, but no one answered and the

8  arrest attempt was ultimately discontinued due to the lack of

9  response and lack of movement in the unit.  (Id. ¶ 18.)  On

10  September 30, 2011, Agent Palmer and another agent again

11  conducted surveillance at the apartment complex from

12  approximately 2:00 to 5:30 p.m., but did not see defendant or any

13  vehicle associated with him.  (Id. ¶ 19.)  After September 30,

14  2011, Agent Palmer ceased surveillance at the apartment complex

15  due to the prior unsuccessful efforts and because the unit

16  associated with defendant did not appear occupied.  (Id. ¶ 20.)

17           During the six-month period when the government

18  unsuccessfully attempted to locate defendant, it is undisputed

19  that he lived in a unit at the Mission Bay apartment complex.  It

20  is also undisputed that he was employed with Bayview

21  Environmental, which the government could have discovered through

22  a more thorough investigation.[2]  There is no evidence or

23  _____

24           [2]    Defendant received his wages from Bayview Environmental
    via check and federal income and social security taxes were

25  withheld.  (Docket No. 95-10 ¶ 3.)
              Defendant was also a member of the Laborers Local Union

26  67 in 2010.  The government did not discover defendant's
    affiliation with that union until after the instant motion was

27  filed when Agent Palmer noticed for the first time that the shirt
    defendant had on in the picture from the charged drug transaction

28  had the Laborers Local Union 67 logo on it.  (See Docket No. 103-

1   suggestion that defendant was aware of the Indictment or trying

2   to evade government detection.  Despite defendant's non-

3   clandestine lifestyle, the government was unable to locate him.

4           After September 30, 2011, the government ceased all

5   active efforts to locate defendant and relied exclusively on the

6   entry of the arrest warrant in its various databases.  When all

7   of the records in the government's possession indicated that

8   defendant lived in a relatively small apartment complex and the

9   onsite manager of that complex confirmed with the agents that

10  defendant lived there, ceasing its efforts to locate defendant

11  after only nine visits to the complex during daytime hours cannot

12  be considered diligent.  If federal law enforcement had elected

13  to allocate sufficient resources to search for defendant, it

14  would be shocking to imagine that they could not have located him

15  when they knew where he lived and he maintained a regular job.

16          For approximately twenty months, however, the

17  government did not make a single effort to locate defendant.  He

18  was arrested on June 17, 2013 only because his scheduled flight

19  to Mexico flagged him in the TECS system.  (Id. ¶ 21.)  The Ninth

20  Circuit has held that such a passive investigation relying only

21  on entry of the arrest warrant in a government database is not

22

23

    _____

24  1.)  Defendant argues that the government could have noticed the
    logo in the picture back in 2010 and contacted the union to

25  determine defendant's place of employment.  (See Docket No. 104-1
    ¶¶ 2-4.)  These efforts would have unquestionably been superior

26  detective work that one would hope to see from the government.
    Nonetheless, Agent Palmer's oversight of the small union logo on

27  defendant's shirt does not, in itself, show that the government
    was not diligent in its search for defendant.

28

1  diligent.  See Mendoza, 530 F.3d at 763; see also Beamon, 992
2  F.2d at 1013.

3  For all of the foregoing reasons, in assessing the
4  relative blame for the delay in arresting defendant after
5  indictment, none of that blame can be assessed to the defendant.
6  There is no reason to believe he knew of the Indictment or took
7  any action to avoid arrest or detection.  To the contrary, all of
8  the blame for the delay lies exclusively with the government.
9  Despite knowing the complex where defendant lived, it ceased all
10  efforts to locate him and simply put the case on the back burner.

11  3.  Defendant's Assertion of his Right to a Speedy
12  Trial

13  The third factor evaluates whether the defendant has
14  asserted his right to a speedy trial.  The Supreme Court has
15  noted that the "defendant's assertion of his speedy trial right[]
16  is entitled to strong evidentiary weight in determining whether
17  the defendant is being deprived of the right."  Barker v. Wingo,
18  407 U.S. 514, 531 (1972); see also Barker, 407 U.S. at 532
19  ("[F]ailure to assert the right will make it difficult for a
20  defendant to prove that he was denied a speedy trial.").  The
21  "strength of [a defendant's] efforts" in asserting his right to a
22  speedy trial "will be affected by the length of the delay, to
23  some extent by the reason for the delay, and most particularly by
24  the personal prejudice, which is not always readily identifiable,
25  that he experiences."  Id. at 531.

26  Here, there is no evidence that defendant was aware of
27  the Indictment prior to his arrest, thus he cannot be faulted for
28  failing to seek a speedy trial prior to his arrest.  Cf. Doggett,

505 U.S. at 653 (indicating that the "third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against" the defendant if the defendant "knew of his indictment years before he was arrested").  After he was arraigned on June 25, 2013, (Docket No. 66), the government and defendant jointly requested two continuances of the October 16, 2013 trial date, which had been set for co-defendant Dionisio Robles Padilla prior to defendant's arrest.  (Docket Nos. 71, 73, 88, 89.)  In United States v. Corona-Verbera, the Ninth Circuit concluded that, because the defendant asserted his right to a speedy trial after requesting eight continuances, the third factor "weighs neither in favor of dismissal nor in favor of the government."  509 F.3d 1105, 1117 (9th Cir. 2007).  Here, the government does not argue that defendant failed to assert his right to a speedy trial, but contends this factor is essentially a wash because defendant sought continuances.

Although defendant did not file this motion asserting his constitutional right to a speedy trial until 210 days after his arraignment and after seeking two continuances, defendant's counsel points out that the motion was filed immediately upon learning that defendant suffered prejudice from the delay because certain phone records were unavailable due to the lapse of time. See Barker, 407 U.S. at 532.  Under these facts, the court finds that defendant sufficiently asserted his right to a speedy trial, and his assertion "is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right."  Id. at 531.

1              4.  <u>Actual Prejudice</u>

2              "Traditionally, actual prejudice can be shown in three

3    ways: oppressive pretrial incarceration, anxiety and concern of

4    the accused, and the possibility that the accused's defense will

5    be impaired."  <u>Beamon</u>, 992 F.2d at 1014.  Defendant does not

6    claim prejudice under either of the first two categories.

7    Rather, defendant seeks to show actual prejudice based on the

8    ground that his defense will be impaired because of the delay.

9    In evaluating prejudice, the court must assess "how much the

10   defense was actually impaired, recognizing that prejudice of this

11   sort cannot be proved easily," and "then balance that impairment

12   with the degree of the government's dalliance."  <u>Id.</u>  The

13   defendant's "[p]roof of prejudice must 'be definite and not

14   speculative.'"  <u>United States v. Manning</u>, 56 F.3d 1188, 1194 (9th

15   Cir. 1995) (quoting <u>United States v. Butz</u>, 982 F.2d 1378, 1380

16   (9th Cir. 1993)).

17             Defendant in this case contends the twenty-six-month

18   delay in his arrest will impair his defense because certain phone

19   records relevant to the charge against him are no longer

20   available.  Specifically, the government seeks to prove that, on

21   August 18, 2010, Agent Palmer ordered methamphetamine from

22   Padilla while meeting with Padilla at an auto repair shop and

23   defendant delivered the methamphetamine to Padilla.  The evidence

24   suggests that Padilla ordered the drugs by placing a call on a

25   landline in the auto repair shop that had the number (707) 652-

26   2603 (the "(707)-line").  Defendant does not deny that he was at

27   the auto repair shop at the time of the charged methamphetamine

28   transaction, but contends that he was there only to discuss

                                  10

1  repairs Padilla had performed to his truck and that he did not

2  deliver the methamphetamine.   To effectively present this

3  theory, it would strongly assist defendant if he can identify the

4  number Padilla called from the (707)-line to order the

5  methamphetamine and show that the number and person called have

6  no connection to him.

7        Of course, if defendant is in fact guilty, it could be

8  argued that it is speculative to assume that he would benefit

9  from identifying that telephone number.  Although defendant has

10  presented evidence that his cell phone did not receive a call

11  from the (707)-line on the date in question, the number called

12  could have belonged to someone else associated with him.  But in

13  assessing the relevance of that information, the court,

14  consistent with the presumption of innocence, must assume the

15  defendant is innocent.[3]  Making that assumption, identifying the

16  phone number Padilla called would be of substantial value to

17  defendant's defense, because it would enable him to ultimately

18  show that he is not connected with the number or person Padilla

19  called to order the methamphetamine and thus that he did not

20  deliver the drugs.  The government could still argue that the

21        [3]    "The evils at which the [Speedy Trial] Clause is
22  directed are readily identified.  It is intended to spare an
   accused those penalties and disabilities--incompatible with the
23  presumption of innocence--that may spring from delay in the
   criminal process."  Dickey v. Florida, 398 U.S. 30, 41 (1970)
24  (Brennan, J., concurring); see also Kaley v. United States, ---
   U.S. ----, ----, 134 S.Ct. 1090, 1110-11, (2014) ("'The
25  presumption of innocence, although not articulated in the
   Constitution, is a basic component of a fair trial under our
26  system of criminal justice.'  Whatever serious crimes the grand
   jury alleges the [defendants] committed, they are presumptively
27  innocent of those charges until final judgment." (quoting Estelle
   v. Williams, 425 U.S. 501, 503  (1976))).

1  person called was somehow associated with defendant, but without

2  some evidence beyond pure speculation to connect defendant to

3  that person it is difficult to imagine how the government could

4  sustain a conviction.

5          The records from the (707)-line are therefore integral

6  to defendant's ability to persuasively present his theory that he

7  was simply in the wrong place at the wrong time.

8          Whether Padilla in fact used the (707)-line to order

9  methamphetamine on August 18 has been a source of disagreement

10  between the parties and ultimately the catalyst for the court

11  granting defendant's motion to reveal the identity of the

12  confidential informant and holding an evidentiary hearing.  A

13  report Agent Sarah Mauricio prepared after a second purchase of

14  methamphetamine from Padilla on August 31, 2010 states:

15  "[Confidential informant] also provided the phone number (707)

16  652-2603, which was identified as the phone line PADILLA uses

17  when placing an order for a delivery of narcotics."  (Docket No.

18  95-2.)  Although defendant was not involved in the sale on August

19  31, he claims this statement showed Padilla customarily uses the

20  (707)-line to order methamphetamine.  The government argues that

21  the statement about the use of the 707-line to order narcotics

22  was limited to the sale on August 31.

23          At the hearing, the confidential informant denied

24  knowledge of Padilla's phone number and testified that he did not

25  tell any of the agents that Padilla uses the 707-line to order

26  narcotics.[4]  Agent Mauricio testified that she could not recall

27  _____

28          [4]  For numerous reasons, including his demeanor while
    testifying, prior multiple felony convictions, and inconsistent

whether Agent Palmer or the confidential informant told her about the (707)-line, but that one of them gave her that number as the line "used" on August 31.  Although the government provided Agent Mauricio's handwritten notes from August 31 to show that there was no notation about the use of that line, the last entry of her notes states, "707-652-2603 → Danny's hard line inside shop." Agent Palmer credibly testified at the hearing that he observed Padilla order the methamphetamine from a landline in the auto repair shop on August 18.  In his report from the August 18 transaction, he also states: "At approximately 2:31 p.m., [confidential informant] received an incoming call from phone number 707-652-2603.  [Confidential informant] recognized the caller as Danny . . . ."  (Docket No. 95-4.)  The August 2010 Comcast phone bill for the auto repair shop also identifies the 707-line as one of two lines on that account.[5]  (Docket No. 107 at 12.)  After considering all of the evidence presented, the court has no reason to doubt that Padilla ordered the methamphetamine on August 18 by placing a call on the (707)-line.

To show that Padilla did not call him or anyone connected to him to order the methamphetamine on August 18, defendant sought and the court granted a Federal Rule of Criminal Procedure 17(c) subpoena to Comcast Cable Communications, LLC ("Comcast") requiring the production of "calls placed to and

---

testimony, the court did not find the confidential informant credible.

[5]   Although the Comcast bill identifies two lines for the account, neither of the parties suggested that this second line was used and, even if it was, the court assumes the records for the second would similarly be unavailable due to the lapse of time.

1  from" the 707-line during 2010.  (Docket No. 78.)  Complete phone

2  records for the 707-line, however, are no longer available due to

3  the delay in defendant's arrest because Comcast retains its

4  complete records for only two years.[6]

5        The actual prejudice defendant claims rises above

6  claims of prejudice based on speculation and generalized

7  assertions that the Ninth Circuit has found insufficient.  For

8  example, in Corona-Verbera, the defendant's claim of prejudice

9  "based on generalized speculation as to what lost or deceased

10  witnesses would have said" was insufficient in the absence of

11  evidence showing how the witnesses would have testified at trial

12  and how that evidence would have aided the defendant.  509 F.3d

13  at 1113; accord United States v. Sherlock, 962 F.2d 1349, 1354

14  (9th Cir. 1989).  Similarly, the Ninth Circuit rejected a claim

15  of prejudice based on the loss of credit card records that "could

16  have explained [defendant's] location at the time of the killing"

17  because the defendant did not "specifically state[] what the

18  credit card records would show."  Manning, 56 F.3d at 1194.

19  _____

20      [6]    In its response to the subpoena, Comcast represented
    that after an extensive off-site search, it could "only verify"
21  three incoming and three outgoing calls on the (707)-line "from
    6/29/2010 to 12/9/2010."  (Docket No. 95-9; see also Docket No.
22  107 at 3.)  None of the identified calls occurred in August.  The
    Comcast bill for the auto repair shop, however, indicates that
23  domestic calls were made on at least one of the two lines in
    August, (see Docket No. 107 at 12), and Agent Palmer's report
24  memorializes a call being made on the (707)-line on August 18,
    (Docket No. 95-4).  Although defendant could have offered more
25  direct evidence to show that the Comcast records are incomplete,
    the government has not suggested that they are complete and the
26  evidence indicates they are not.  Defendant has therefore
    sufficiently shown that the Comcast records for the (707)-line in
27  August 2010 are incomplete due to the government's delay.

28
                                14

Here, defendant has presented sufficient evidence showing that Padilla ordered methamphetamine using the (707)-line and that the destroyed Comcast records would have identified the number Padilla called.  If he had the records showing which numbers were called from that number during the relevant time period, defendant would be able to show that it was not his phone or the phone of any one associated with him.  If he had been arrested reasonably soon after indictment, there is good reason to believe those records could have been produced in response to his subpoena.  Because of the delay caused by the government, those records are unavailable.  This is neither speculation nor some generalized assertion of prejudice.

This prejudice strikes at the core of defendant's defense and was caused solely by the government's decision to cease what should have been a relatively simple effort to locate him.  When balancing all of the factors, the only one that weighs slightly in favor of the government is that the delay was twenty-six months and did not reach an extreme duration exceeding five years as in other cases.  The length of the delay alone, which was still more than double the minimal threshold, cannot alone save the day for the government if the Sixth Amendment is to have any meaning outside of cases with extreme delays.  Here, the government was not diligent in searching for defendant and the resulting delay in defendant's arrest caused him actual prejudice by depriving him of evidence that would undeniably tend to prove his innocence.

Although defendant has not advanced a flawless theory of actual prejudice, he does not rely on speculation alone and,

1  when balanced against the other factors, has made a sufficient

2  showing of prejudice under the facts of this case.  Accordingly,

3  the Sixth Amendment requires that the court grant defendant's

4  motion to dismiss the Indictment.

5          IT IS THEREFORE ORDERED that defendant's motion to

6  dismiss the Indictment be, and the same hereby is, GRANTED; and

7  the Indictment is hereby DISMISSED as against defendant Nelson

8  Mauricio Ponce Vasquez only.

9  Dated:  April 11, 2014

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

16